NATIONAL FEDERATION OF
FEDERAL EMPLOYEES,
Plaintiff,

v.

UNITED STATES of America, et
al., Defendants.

AMERICAN FEDERATION OF
GOVERNMENT EMPLOYEES,
AFL–CIO, et al., Plaintiffs,

v.

Steven GARFINKEL, et al., Defendants.

Civ. A. Nos. 87–2284OG, 87–2412OG.

United States District Court,
District of Columbia.

July 29, 1988.

On Motion to Alter or Amend Judgment
Sept. 26, 1988.

Bruce Heppen, National Federation of Federal Employees, Washington, D.C., for plaintiff in C.A. 87–2284.

Stuart Kirsch, American Federation of Government Employees, Atlanta, Ga. and Joseph Kennedy, Government Accountability Project, Washington, D.C., for plaintiffs in C.A. 87–2412.

Robert Irvin, Dept. of Justice, Washington, D.C., for defendants.

## MEMORANDUM

GASCH, Senior District Judge.

In lengthy complaints, plaintiffs in these consolidated cases[1] allege numerous violations of the Constitution and statutes by reason of a federal government program that requires federal employees to sign agreements in which the employees pledge not to disclose classified information without authorization. The plaintiffs are two labor unions that represent many federal employees and three individuals who have signed or been directed to sign one of these agreements. In a memorandum and order filed May 27, 1988, 688 F.Supp. 671, the Court substantially pared the complaints, leaving claims under the First and Fifth Amendments to the Constitution, the Administrative Procedure Act, 5 U.S.C. §§ 701–706, and 5 U.S.C. § 7211, which guarantees to federal employees the right to petition Congress.

Before the Court are defendants' Motion to Dismiss, plaintiffs' Motion for Summary Judgment, and plaintiff Brase's further Motion for Summary Judgment. Because the Court has considered evidence extrinsic to the pleadings and the parties have had adequate opportunity to make such submissions, the defendants' Motion to Dismiss will be treated as a Motion for Summary Judgment. *See Sacks v. Reynolds Securities, Inc.,* 593 F.2d 1234, 1239 (D.C.Cir. 1978); Fed.R.Civ.P. 12(b). The Court's action on these motions will resolve all of plaintiffs' remaining claims.

## I. BACKGROUND

In August and September of 1987, plaintiffs filed these cases to enjoin implementation and enforcement of the provisions of federal government Standard Forms 189 ("SF 189") and 4193 ("SF 4193") and Department of Defense form DD 1847–1. With important differences, these forms contain an agreement that imposes civil sanctions on the federal employee signatory for making unauthorized disclosures of certain government information. The SF 189 is used generally throughout the Executive Branch and is administered by the Information Security Oversight Office ("ISOO"). Exhibit 3 to Defendants' Opposition to Plaintiffs' Motion for Preliminary Injunction. The Director of Central Intelligence ("DCI") uses the SF 4193 for employees who have access to Sensitive Compartmented Information ("SCI").[2] Exhibit 5 to Defendants' Opposition to Plaintiffs' Motion for Preliminary Injunction. The DD 1847–1 is essentially the same as the SF 4193 and is presented to the same type of employees. Exhibit 4 to Defendants' Motion to Dismiss (filed Dec. 15, 1987).

The forms were prepared after a report by an Interdepartmental Committee of the Executive Branch suggested that civil penalties would deter unauthorized revelation of classified information. REPORT OF THE

1. Hereinafter, *National Federation of Federal Employees v. United States,* Civil Action No. 87–2284 (D.D.C. filed Aug. 17, 1987) shall be referred to as *NFFE* and *American Federation of Government Employees v. Garfinkel,* Civil Action No. 87–2412 (D.D.C. filed Sep. 1, 1987) shall be referred to as *AFGE.*

2. Both the SF 4193 and the DD 1847–1 refer expressly to SCI. Although such information is a subcategory of classified information, the distinction is generally not relevant to plaintiffs' claims. Throughout this memorandum, SCI will be distinguished from the general category of classified information only when the distinction is material.

INTERDEPARTMENTAL GROUP ON UNAUTHO-RIZED DISCLOSURES OF CLASSIFIED INFORMA-TION A–6 (Mar. 31, 1982); *see* National Security Decision Directive 84 ¶ 1 (Mar. 11, 1983) [hereinafter NSDD 84]. The nondisclosure agreements embodied in the forms became a part of the Executive's comprehensive scheme for safeguarding national security information—a scheme that has its roots in the early years of this century. *See* Exec. Order No. 12,356, *reprinted in* 47 Fed.Reg. 14,874 (Apr. 2, 1982) [hereinafter Exec. Order 12,356]; *see also Developments in the Law—The National Security Interest and Civil Liberties,* 85 Harv.L.Rev. 1130, 1193–94 (1972) (as early as World War I, Executive implemented scheme to protect national security information). Plaintiffs attack this recent addition to the scheme on the grounds that certain language in the forms impermissibly intrudes upon the First and Fifth Amendment rights of signatories to the forms. Of less substantial dimension are plaintiffs' additional claims that promulgation of the forms was arbitrary, capricious, and contrary to law, 5 U.S.C. §§ 701–706, and that the restrictions imposed by the forms violate a statutory assurance that federal employees may communicate with Congress without interference. 5 U.S.C. § 7211.

In all, three provisions of the forms are the subject of these constitutional and statutory challenges. First, each of the forms uses the term "classifiable" to describe the type of information that implicates the obligations imposed by the forms. The SF 189, for example, states:

As used in this Agreement, *classified information is information that is either classified or classifiable under the standards of Executive Order 12356,* or under any other Executive order or statute that prohibits the unauthorized disclosure of information in the interest of national security.

SF 189 ¶ 1 (emphasis added). Also common to the forms is paragraph three which suggests that "indirect unauthorized disclo-

sure" of classified information is a violation of the federal employee's obligation to protect such information. Finally, the SF 4193 and DD 1847–1 contain a prepublication review provision:

In consideration of being granted access to Sensitive Compartmented Information and of being assigned or retained in a position of special confidence and trust requiring access to Sensitive Compartmented Information, I hereby agree to submit for security review by the Department or Agency that last authorized my access to such information, all information or materials, including works of fiction, which contain or purport to contain any Sensitive Compartmented Information or description of activities that produce or relate to Sensitive Compartmented Information or that I have reason to believe are derived from Sensitive Compartmented Information, that I contemplate disclosing to any person not authorized to have access to Sensitive Compartmented Information or that I have prepared for public disclosure.

DD 1847–1 ¶ 4.

Since the plaintiffs' initial assault on these provisions, some changes have been made to the forms. In response to complaints that "classifiable" is unconstitutionally vague and overbroad, the ISOO made several attempts to refine the definition. The most recent definition declares:

As used in paragraph 1 of SF 189, the term "classifiable information" refers to two categories of information only: (a) Unmarked *classified* information, including oral communications; and (b) *unclassified* information that meets the standards for classification and is in the process of a classification determination.

52 Fed.Reg. 48,367 (Dec. 21, 1987) (emphasis in original) (amending 32 C.F.R. § 2003.20(h)(1)(i)).[3] Shortly after this supposed improvement, the implementation and enforcement of the forms were suspended entirely in response to section 630 of the Omnibus Continuing Resolution for

---

**3.** This redefinition of "classifiable" applies only to the SF 189. Neither the DCI nor the DOD has adopted this definition of the term, and exami-nation of the SF 4193 and DD 1847–1, therefore, must proceed as though the term had received no regulatory elaboration.

Fiscal Year 1988, Pub.L. No. 100–202 (Dec. 22, 1987).[4] Most recently, the ISOO announced its intention to supersede SF 189 with an agreement that omits the phrases "classifiable" and "indirect unauthorized disclosure."[5] Letter from Steven Garfinkel to Representative Jack Brooks (June 16, 1988) (filed July 1, 1988).

The SF 4193 has undergone a less dramatic evolution. On March 18, 1988, the form was replaced with SF 4355 which eliminates reference to "classifiable" information. The prepublication review requirement and the phrase "indirect unauthorized disclosure" remain in the form. Neither the DCI nor the DOD has suggested that the form will undergo further modification.

Although these changes redound to the benefit of future signatories to the nondisclosure agreements, plaintiffs continue to assert their constitutional and statutory claims for those employees who signed the forms as they were originally drafted. Of course, plaintiffs continue to assert these claims as to the remaining portions of the amended forms that they consider offensive.

## II. DISCUSSION

Of the four theories with which plaintiffs attack the nondisclosure agreements, the two that are premised on constitutional rights demand careful scrutiny by the Court. Additionally, these theories supersede plaintiffs' claim under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(A), because any violation of a constitutional right is necessarily "contrary to law." Because the premises of the APA claim are the alleged violations of the First and Fifth Amendment, resolution of the constitutional issues will be dispositive of the APA claim. Additionally, the relief appropriate, if plaintiffs prevail on their constitutional claims, would be the same under the APA. Finally, whether the non-

disclosure agreements violate the statutorily guaranteed right of federal employees to communicate with Congress is a question the Court need not address. None of the plaintiffs claims that any obligation created by the agreements has been invoked to bar their communication with Congress.

### A. The Constitutional Principles Applicable To The Nondisclosure Agreements

At the heart of this case is a constitutionally inherent conflict between the obligation of the Executive to safeguard national security information and the rights of citizens to speak freely and be guided by reasonably clear and narrow statutory proscriptions on the free speech right. Reconciliation of these competing interests is made more difficult in this case by the dual role of plaintiffs as citizens and members of the Executive Branch. *See United States Civil Service Commission v. National Association of Letter Carriers,* 413 U.S. 548, 564, 93 S.Ct. 2880, 2890, 37 L.Ed.2d 796 (1973). Executive employees unquestionably have an obligation to preserve the secrecy of national security information, *see Department of Navy v. Egan,* — U.S. ——, 108 S.Ct. 818, 824, 98 L.Ed. 2d 918 (1988) (security clearance premised on trustworthiness of employee to protect sensitive information); *Snepp v. United States,* 444 U.S. 507, 510–11 & n. 6, 100 S.Ct. 763, 765–66 & n. 6, 62 L.Ed.2d 704 (1980) (per curiam) (employee with access to "secret" information enters special trust relationship with government); 5 U.S.C. § 7532 (Executive employee may be suspended if "necessary or advisable in the interests of national security"), and the President has broad discretion to ensure that his employees are faithful to this obligation. *See Egan,* 108 S.Ct. at 824–25; *CIA v. Sims,* 471 U.S. 159, 170, 105 S.Ct. 1881, 1888, 85 L.Ed.2d 173 (1985); *Cole v.*

---

**4.** In its May 27 memorandum and order, the Court struck down section 630 as an unconstitutional intrusion by the Congress upon the power of the Executive to conduct this nation's foreign affairs. Mem. op. at 25–30.

**5.** Although these proposed changes accommodate many of plaintiffs' concerns regarding the SF 189, the changes may not be considered by the Court in evaluating the lawfulness of the form. The changes have not been implemented, and any remedial effect of the changes on previously executed agreements is purely speculative.

*Young*, 351 U.S. 536, 546, 76 S.Ct. 861, 868, 100 L.Ed. 1396 (1956) (summary suspension of employee in "sensitive" position justifiable); *U.S. v. Curtiss–Wright Corp.*, 299 U.S. 304, 320, 57 S.Ct. 216, 221, 81 L.Ed. 255 (1936) (secrecy "may be highly necessary" and "premature disclosure ... productive of harmful results"); 50 U.S.C. § 403(d)(3) (CIA entrusted to protect intelligence sources and methods). Supplementing this discretion are the government's

> interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general.

*Pickering v. Board of Education*, 391 U.S. 563, 569, 88 S.Ct. 1731, 1735, 20 L.Ed.2d 811 (1968).

■ Countervailing the substantial authority of the President in his national security domain are constitutional principles that preclude him from conditioning federal employment upon relinquishment of a constitutional right. *See Perry v. Sinderman*, 408 U.S. 593, 597, 92 S.Ct. 2694, 2697, 33 L.Ed.2d 570 (1972). While no applicant for federal employment may demand a security clearance, *Egan*, 108 S.Ct. at 824, the Executive may not condition such clearance, which may be a prerequisite to employment, on execution of an agreement that unconstitutionally restricts the applicant's speech.

> The problem in any case is to arrive at a balance between the interests of the [employee], a citizen, in commenting upon matters of public concern and the interest of the [government], as an employer, in promoting the efficiency of the public services it performs through its employees.

*Pickering*, 391 U.S. at 568, 88 S.Ct. at 1734. The weight of these interests is measured by complementary constitutional principles that incorporate First and Fifth Amendment values. *See McGehee v. Casey*, 718 F.2d 1137, 1142–43 (D.C.Cir.1983). Because censorship is inimical to free speech, the first of these principles requires that any "restriction[ ] on the speech of government employees must 'protect a substantial

government interest unrelated to the suppression of free speech.' " *Id.* (quoting *Brown v. Glines*, 444 U.S. 348, 354, 100 S.Ct. 594, 599, 62 L.Ed.2d 540 (1980) and citing *Snepp*, 444 U.S. at 509 n. 3, 100 S.Ct. at 765 n. 3). The repugnance of overbroad and vague restrictions on free speech is embodied in the second principle which demands that any "restriction must be narrowly drawn to 'restrict speech no more than is necessary to protect the substantial government interest.' " *Id.* (quoting *Brown*, 444 U.S. at 355, 100 S.Ct. at 600 and citing *National Association of Letter Carriers*, 413 U.S. at 580, 93 S.Ct. at 2897).

At issue in *Brown* were Air Force regulations that prohibited the solicitation of signatures on a petition within the confines of an Air Force base except by permission of the commanding officer. A related regulation barred the distribution of printed material without such permission. 444 U.S. at 349–50, 100 S.Ct. at 597. In sustaining the regulations, the Supreme Court explained that First Amendment protections may be tempered by governmental interests:

> " 'Speech that is protected in the civil population may ... undermine the effectiveness of response to command.' " *Parker v. Levy*, [417 U.S. 733, 759, 94 S.Ct. 2547, 41 L.Ed.2d 439 (1974) ], quoting *United States v. Priest*, 21 U.S.C.M. A. 564, 570, 45 C.M.R. 338, 344 (1972). Thus, while members of the military services are entitled to the protections of the First Amendment, "the different character of the military community and of the military mission requires a different application of those protections." *Parker v. Levy*, 417 U.S., at 758 [94 S.Ct. at 2562]. The rights of military men must yield somewhat " 'to meet certain overriding demands of discipline and duty....' " *Id.*, at 744 [94 S.Ct. at 2556], quoting *Burns v. Wilson*, 346 U.S. 137, 140 [73 S.Ct. 1045, 1047, 97 L.Ed. 1508] (1953) (plurality opinion). Speech likely to interfere with these vital prerequisites for military effectiveness therefore can be excluded from a military base. [*Greer v. Spock*, 424 U.S. 828, 840, 96

S.Ct. 1211, 1218, 47 L.Ed.2d 505 (1976) ]. . . .

444 U.S. at 354–55, 100 S.Ct. at 599–600 (footnote omitted). The *Brown* Court concluded that the Air Force regulations violated by Glines were "reasonably necessary to protect the substantial governmental interest ... and prevent[ed] commanders from interfering with the circulation of any materials other than those posing a clear danger to military loyalty, discipline, or morale." *Id.* at 355, 100 S.Ct. at 600.

While the nondisclosure agreements are intended to preserve the secrecy of classified information, not to maintain military discipline, the broader governmental interest served by these two purposes is nearly identical—the preservation of national security. Thus, while all governmental employees enjoy First Amendment rights, *Perry*, 408 U.S. at 597, 92 S.Ct. at 2697; *see Branti v. Finkel*, 445 U.S. 507, 514, 100 S.Ct. 1287, 1292, 63 L.Ed.2d 574 (1980), those with access to classified information must accept a different application of free speech protections. Because the government's interest in safeguarding national security information is undeniably substantial and unrelated to the suppression of free speech, the Court focuses upon whether the challenged portions of the nondisclosure agreements are sufficiently precise to restrict no more speech than is necessary to serve the government's interest.[6] Any portion of the agreements that is vague or overbroad necessarily fails this test. *See Cole v. Richardson*, 405 U.S. 676, 680–81, 92 S.Ct. 1332, 1335–36, 31 L.Ed.2d 593 (1972).

B. *The Constitutionality Of The Prepublication Review Requirement Has Been Established*

■ In *Snepp v. United States*, 444 U.S. 507, 100 S.Ct. 763, 62 L.Ed.2d 704 (1980) (per curiam), the United States sought to enforce an agreement, signed by Snepp upon his entry into the CIA, in which Snepp promised "not to publish ... any informa-

tion or material relating to the Agency, its activities or intelligence activities generally, either during or after the term of [his] employment ... without specific prior approval by the Agency." *Id.* at 508, 100 S.Ct. at 764. Affirming the lower courts' enforcement of the agreement, the Court rejected Snepp's claim that the agreement embodied an unconstitutional prior restraint:

> We agree with the Court of Appeals that Snepp's agreement is an "entirely appropriate" exercise of the CIA Director's statutory mandate to "protec[t] intelligence sources and methods from unauthorized disclosure," 50 U.S.C. § 403(d)(3). [*U.S. v. Snepp*] 595 F.2d [926], at 932 [ (4th Cir.1979) ]. Moreover, *this Court's cases make clear that— even in the absence of an express agreement—the CIA could have acted to protect government interests by imposing reasonable restrictions on employee activities that in other contexts might be protected by the First Amendment....* The Government has a compelling interest in protecting both the secrecy of information important to our national security and the appearance of confidentiality so essential to the effective operation of our foreign intelligence service.... The agreement that Snepp signed is a reasonable means for protecting this vital interest.

*Id.* at 509 n. 3, 100 S.Ct. at 765 n. 3 (emphasis added). This unequivocal statement by the Supreme Court leaves no doubt that a prepublication requirement imposed upon government employees with access to classified information is entirely constitutional. That the agreement in *Snepp* covered only "secret" information and was executed only by CIA employees does not change the gravity of the government's interest in assuring the secrecy of national security information, nor do these distinctions render the agreements a less reasonable means for protecting that interest. Indeed, be-

---

**6.** There is no dispute that the government has no interest in censoring unclassified information. Defendants state repeatedly that the agreements by their language encompass only classified information. Because the agreements define classified information to include "classifiable" information, the defendants' statement begs a central question in this case.

cause the SF 4193, SF 4355, and DD 1847–1 require prepublication review only of documents relating to SCI, these agreements are more narrowly proscriptive of speech that the agreement in *Snepp.*

### C. *"Classifiable" Information*

All the nondisclosure agreements involved in this case prohibit the unauthorized disclosure of classified information. As originally drafted, the SF 189, SF 4193, and DD 1847–1 defined classified information as information that is "classified or classifiable." In response to objections regarding the meaning of "classifiable," the ISOO elaborated several times upon the term as used in the SF 189. *See, e.g.,* 52 Fed.Reg. 48,367 (Dec. 21, 1987); 52 Fed. Reg. 29,793 (Aug. 11, 1987). Although the DCI never adopted these regulatory definitions of the term, it has superseded SF 4193 with a form that omits reference to "classifiable" information. No revisions of the DD 1847–1 have been brought to the Court's attention.

Regardless of regulatory definitions or revisions, the original versions of the forms were executed by many federal employees. Plaintiffs complain that because the ISOO's definition has not been distributed to each of the signatories to the SF 189, the agreement must be evaluated as though no such definition had taken place. Their reasoning is that the unconstitutional chill on First Amendment rights is threatened by the language of the agreement known to the signatory. Any definition given to "classifiable" beyond the four corners of the agreement has no bearing on the constitutional question because signatories to the agreement have not been notified of the definition.[7]

In addition to challenging "classifiable" as originally used in the agreements, plaintiffs contend that the ISOO's redefinition does not fully comport with constitutional requirements. They complain particularly that the latest definition impermissibly extends the scope of the SF 189 beyond information that the employee knows to be classified. Applying the agreement to information that the employee reasonably should have known to be classified requires the employee to make his own classification determination, and Executive Order 12,356 expressly restricts this power to a small group of designated officials. *See* Exec. Order 12,356 § 1.2. Further, plaintiffs object to imposition of liability for negligent disclosure of information.

1. *"Classifiable" On Its Face Is Insufficiently Narrow To Survive Constitutional Scrutiny*

■ Although restraints on the free speech of federal employees has been condoned by the Supreme Court, the mechanism of restraint must be carefully tailored. *See Brown,* 444 U.S. at 355, 100 S.Ct. at 600. Applying the nondisclosure agreements to "classifiable" information is permissible only if the term is defined narrowly to include no more information than is necessary to further the government's need for secrecy. *See McGehee,* 718 F.2d at 1143 (citing *Brown* ). As originally used in the SF 189, SF 4193, and DD 1847–1, "classifiable" benefitted from no clarifying definition. Employees who executed the forms were left to assign their own meaning to the term.

On its face, "classifiable" has not readily discernible meaning. Indeed, prior to his promulgation of definitions in the Code of Federal Regulations, the Director of the ISOO apparently admitted that "arguably it could mean anything." Letter from Representative Gerry Sikorski to Frank Carlucci 2 (June 24, 1987) (quoting ISOO Director Steven Garfinkel). At its broadest, the term applies to any information that would be classified if examined by a classification authority. Within this broad definition is information that does not become classified until its disclosure piques the concerns of the Executive. Also included is informa-

---

**7.** Constitutional scrutiny of the SF 4193 is unaffected by the ISOO's several redefinitions of "classifiable" because the DCI has not adopted them. Similarly, differences between the SF 4193 and SF 4355 are irrelevant because the omission of "classifiable" from the latter does not apply to the former. Thus, the Court must examine the term as redefined by the ISOO for the SF 189 and as used without elaboration by the DCI in the SF 4193.

tion that becomes classified in the future though only speculation would have suggested that such classification would occur.

■ From this extreme end of the spectrum of definitions, numerous successively narrower definitions could be given. Any one of these definitions might reasonably have been adopted by federal employees executing the SF 189, SF 4193, or DD 1847-1. Given this array of definitions, the Court cannot conclude that applying the obligations of the nondisclosure agreements to "classifiable" information is a mechanism that "restrict[s] speech no more than is necessary to protect the substantial government interest." *Brown,* 444 U.S. at 355, 100 S.Ct. at 600.

### 2. "Classifiable" As Defined For The SF 189

■ Before these lawsuits were filed, plaintiffs made known to the ISOO their concerns regarding the language of the nondisclosure agreements. A regulatory definition of "classifiable" and a refinement of that definition were promulgated, purporting to address some of these concerns. The most recent of these states:

(i) ... [T]he term "classifiable information" refers to two categories of information only: (a) Unmarked *classified* information, including oral communications; and (b) *unclassified* information that meets the standards for classification and is in the process of a classification determination. "Classifiable information" does *not* refer to currently unclassified information that may be subject to possible classification at some future date, but is not currently in the process of a classification determination. Therefore, the only circumstances under which a party to SF 189 might violate its terms by disclosing *unclassified* information are when a party knows, or reasonably should know, that such information is in the process of a classification determination and requires interim protection. . . .

(ii) A party to SF 189 may be liable for disclosing "classifiable information" only if: (a) He or she knows that the un-marked information is classified, or meets the standards for classification and is in the process of a classification determination, whether the unauthorized disclosure is willful or negligent; or (b) he or she should know that the unmarked information is classified, or meets the standards for classification and is in the process of a classification determination, in which case the unauthorized disclosure is negligent. In no instance could a party to SF 189 be liable for violating its nondisclosure provisions by disclosing unmarked information when, at the time of the disclosure, there was no basis to suggest, other than pure speculation, that the information was classified or in the process a classification determination.

52 Fed.Reg. 48,367 (Dec. 21, 1987) (emphasis in original) (amending 32 C.F.R. § 2003.20(h)(1)). Unlike "classifiable" on its face, this regulatory definition of the term certainly would guide SF 189 signatories in fulfilling their obligations under the agreement. Plaintiffs complain, however, that liability for negligent disclosure or for disclosure of information the employee should reasonably know to be classified is not a narrowly drawn means for protecting the government's substantial interest in protecting national security. They insist that liability must be based on scienter or intent.

Were plaintiffs correct, the government would be empowered to punish with civil sanctions only intentional disclosures of information the employee knew to be classified or knew to be in the process of a classification determination and to meet the standards for classification. By necessity, however, much classified information is not marked as such because it has not been examined by a classification authority. The government nevertheless has a substantial interest in safeguarding that information. Plaintiffs' suggested construction of "classifiable" draws too narrowly the bounds of the nondisclosure agreements.

[6] The definition offered by the ISOO simply requires that employees consider whether they have reason to believe that

unmarked information is classified or should be classified and is in the process of becoming so. The reasonable person standard is one to which people are held in all their activities, and it does not become unconstitutionally vague simply because First Amendment rights are involved. Indeed, it is as precise as possible given the vast array of information possessed by the government. Thus, the ISOO's regulatory definition of "classifiable" information does not violate constitutional norms.

■ The value of this constitutionally permissible definition is limited, unfortunately, because it is unlikely that those employees who have signed the SF 189 have been informed of the definition. Until an employee becomes aware of the regulatory definition, he cannot know that "classifiable" information does not include, for example, information that only speculation suggests will become classified. So long as signatories to the SF 189 are unaware of the ISOO definition of "classifiable," constitutional norms do not allow them to be liable for any disclosure of such information. Notice of the definition is essential.

The obvious remedy for this lack of notice is distribution of the regulatory definition of "classifiable" that appears in 32 C.F.R. § 2003.20(h)(1). The ISOO, DCI, and DOD may choose whatever mechanism for distribution they deem most efficient; the mechanism simply must deliver as soon as practicable a copy of section 2003.-20(h)(1) to every employee who has or will sign a nondisclosure agreement using the word "classifiable." Until such distribution occurs, the agreements may not be enforced to penalize disclosure of "classifiable" information. Alternatively, these agencies may choose to distribute a notice that deletes "classifiable" from the agreements and states that no employee shall be liable for disclosure of "classifiable" information.

### D. *"Indirect Unauthorized Disclosure"*

Plaintiffs' final constitutional objection to the nondisclosure agreements regards the admonition that "indirect unauthorized disclosure" of classified information or SCI

"could cause irreparable injury to the United States or be used to advantage by a foreign nation." SF 189 ¶ 3; SF 4193 ¶ 3; DD 1847–1 ¶ 3. Following this warning, the agreements elicit a promise from the employee not to "divulge such information to anyone who is not authorized to receive it without prior written authorization." *Id.* Repeating their First and Fifth Amendment arguments, plaintiffs insist that the term is broader than necessary to protect the government's substantial interest in the secrecy of classified information.

At first glance, plaintiffs' argument is sensible because a promise not to divulge indirectly any classified (or classifiable) information imposes absolute liability upon the employee for any unauthorized disclosure. Closer scrutiny, however, reveals that while it may be unfair to hold an employee absolutely liable, First Amendment rights are not implicated. The freedom of federal employees to speak freely is impaired by limitations on the content of their speech. Thus, an overly broad definition of "classifiable" is constitutionally unacceptable. However, if federal employees have no constitutional right to disclose certain information, they cannot complain that disclosure is absolutely prohibited. Accordingly, no constitutional concerns are raised by the use of the term "indirect unauthorized disclosure."

### E. *Plaintiffs Fail To State A Claim Under 5 U.S.C. § 7211*

Wholly apart from their constitutional claims, plaintiffs in *AFGE* insist that the nondisclosure agreements violate their statutory right as federal employees to communicate with Congress. The right has been assured for many years, and in its most recent incarnation, the relevant statute provides:

> The right of employees, individually or collectively, to petition Congress or a Member of Congress, or to furnish information to either House of Congress, or to a committee or Member thereof, may not be interfered with or denied.

5 U.S.C. § 7211. Plaintiffs argue that the nondisclosure agreements interfere with the right guaranteed by this statute.

■ In order to state a claim for relief under this statute, plaintiffs must at least allege that they have disclosed or intend to disclose some classified or classifiable information to Congress and have been threatened with enforcement of the nondisclosure agreements. No such allegation appears in the complaint. Apparently, the *AFGE* plaintiffs hope to rely upon the unusually liberal construction accorded claims under the First Amendment. This liberality allows the chilling effect of anticipated governmental action to form the basis for a claim under the First Amendment. *See Laird v. Tatum*, 408 U.S. 1, 11, 92 S.Ct. 2318, 2324, 33 L.Ed.2d 154 (1972); *National Federation of Federal Employees v. United States*, 688 F.Supp. 671, 682–83 (D.D.C.1988). There is no justification, however, for so liberally construing the statutory claim asserted by plaintiffs. Because plaintiffs in *AFGE* fail to state an essential element of their claim in count V, summary judgment for defendants is proper. *See District of Columbia v. Air Florida, Inc.*, 750 F.2d 1077, 1078 (D.C.Cir. 1984).

## III. CONCLUSION

In order to add civil sanctions to its arsenal of weapons protecting national security information, the government requires its employees with access to classified information to sign a nondisclosure agreement. Plaintiffs challenge three aspects of the forms as unconstitutional or contrary to statute. Regarding plaintiffs' resistance to the prepublication review requirement in the SF 4193 and DD 1847–1, the Supreme Court has already determined that such a requirement is consistent with the First Amendment rights of federal employees.

A novel issue is raised, however, regarding use of the term "classifiable" to describe information the disclosure of which is prohibited by the agreements. In the absence of any definition, the term is far too broad to comport with the constitutional requirement that restraints on free speech be narrowly drawn to bar no more speech than is necessary. Because no such definition has been offered with respect to the SF 4193 and DD 1847–1, use of the term in those forms is unconstitutional. While the definition promulgated by the ISOO is appropriately narrow, it has never been published to signatories of the SF 189. The constitutional infirmity in all the forms may be remedied by distribution of the ISOO's definition of "classifiable" to any federal employee who has signed or will sign an agreement incorporating that term. Until these federal employees are informed of the refined definition of classifiable, the agreements may not be enforced for disclosures of classifiable information. Alternatively, a notice may be distributed stating that "classifiable" is retroactively deleted from all agreements.

Plaintiffs' final constitutional claim concerns the proscription in the agreements against "indirect unauthorized disclosure" of classified (or classifiable) information. Though successful regarding the term "classifiable," First and Fifth Amendment arguments have no force when applied to the phrase "indirect unauthorized disclosure." At its broadest, the phrase imposes absolute liability on an employee who may be linked to the disclosure of classified (or classifiable) information. Although this may be unfair, it has no First or Fifth Amendment implications. If an employee has no right to disclose certain information, he cannot complain that the government entirely prohibits such disclosure.

Finally, the Court grants summary judgment for defendants on the claim in *AFGE* that the agreements violate 5 U.S.C. § 7211. While plaintiffs certainly have a statutory right to communicate with Congress, they fail to allege that the right has been violated. At most, they anticipate such a violation, but such an allegation is insufficient to state a claim under this statute.

## FINAL JUDGMENT AND ORDER

Upon consideration of defendants' Motion to Dismiss and plaintiffs' Motions for Summary Judgment, the oppositions there-

to, and the record herein, and for the reasons stated in the accompanying memorandum, it is by the Court this 28th day of July, 1988

ORDERED that defendants' Motion to Dismiss be, and hereby is, granted as to counts V and VII in Civil Action No. 87–2412 and denied as to the remaining counts; and it is further

ORDERED that plaintiffs' Motions for Summary Judgment be, and hereby are, granted, in part, as to count II in Civil Action No. 87–2284 and as to counts I and II in Civil Action No. 87–2412, and denied as to all remaining counts; and it is further

ADJUDGED AND DETERMINED that use of the term "classifiable" in SF 189, SF 4193, DD 1847–1, or any other nondisclosure agreement is unconstitutional unless the form includes or is accompanied by the definition of "classifiable" that appears in 32 C.F.R. § 2003.20(h)(1); and it is further

ADJUDGED AND DETERMINED that an agreement includes or is accompanied by the definition of "classifiable" that appears in 32 C.F.R. § 2003.20(h)(1) if this section of the C.F.R. is reprinted and:

(1) Presented to the employee at the time the agreement is executed; or

(2) Delivered within sixty (60) days of the date of this Order to the employee who has already signed the agreement; and it is further

ORDERED that until the employee receives a copy of the definition of "classifiable," the nondisclosure agreement may not be enforced to penalize the employee for disclosure of "classifiable" information; and it is further

ORDERED that in lieu of delivery or presentment of the definition of "classifiable," the Information Security Oversight Office, the Director of Central Intelligence, the Department of Defense, and any other agency that has used a nondisclosure agreement containing the word "classifiable" may notify every employee that has signed such an agreement that "classifiable" is stricken from the agreement and that liability shall not arise under the agreement for disclosure of "classifiable" information; and it is further

ORDERED that within sixty (60) days of the date of this Order each employee that has signed a nondisclosure agreement containing the word "classifiable" shall receive a copy of the definition of "classifiable" that appears in 32 C.F.R. § 2003.20(h)(1) or notice that the word is stricken from the agreement and shall not be a basis for liability.

## ON MOTION TO ALTER OR AMEND JUDGMENT

Upon consideration of the defendants' motion to alter or amend judgment, the oppositions thereto, and the record herein, and it appearing from the representations of government counsel in open court that the word "classifiable" has been deleted in some instances and other words substituted therefor; and it further appearing that to the extent that "classifiable" is still deemed binding on certain government employees, that those who are deemed bound by the nondisclosure agreement be given actual notice as hereinafter provided, it is by the Court this 25th day of September, 1988,

ORDERED that defendants' motion be, and hereby is, granted in part and denied in part; and it is further

ORDERED that the defendants are granted an additional thirty (30) days within which to comply with this Court's Order of July 29, 1988, so that within ninety (90) days of the date of the Court's original Order, each employee who has signed a nondisclosure agreement containing the word "classifiable" shall either receive a copy of the definition of "classifiable" as the same appears in 32 C.F.R. § 2003.20(h)(1) or notice that the word has been stricken from the agreement and what, if any, words have been substituted in lieu thereof.